(63 South. 51.)

No. 19,277.

BURKE v. NEW ORLEANS RY. & LIGHT CO. et al.

(March 17, 1913. On Rehearing, June 9, 1913.)

*(Syllabus by the Court.)*

1. EVIDENCE (§ 29*)—JUDICIAL NOTICE—STATUTES.

Where the Legislature grants to a railroad company certain rights, ways, privileges, and servitudes, and in the same statute requires it to maintain certain gates and signals, these latter are for the protection of the general public, and the statute, imposing an obligation in favor of the public, is a public statute and within notice of the court without being offered in evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 36, 37, 39, 43–46, 48; Dec. Dig. § 29.*]

2. RAILROADS (§ 288*) — COLLISION WITH STREET CAR—LIABILITY.

Where a railroad company fails to provide the signals, required by a statute, at a street railway crossing, and the motorman, because he is unable in the darkness either to see the track, or a train approaching thereon, is unable to stop his car in time to avoid striking the train, the railroad company is liable for his injuries. The defendant company does not and cannot plead ignorance of the cited act.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 928–932; Dec. Dig. § 288.*]

3. MASTER AND SERVANT (§ 111*)—SAFE APPLIANCES—STREET RAILROADS.

A street railway company must provide its motorman with serviceable brakes, and where it fails to do so, and the motorman, because of such defective brakes, is unable to stop his car in time to avoid striking a railroad train, the street railway company is liable to him for his injuries.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 215–217, 255; Dec. Dig. § 111.*]

Provosty, J., dissenting.

On Rehearing.

4. MASTER AND SERVANT (§§ 236, 240*)—RAILROADS (§ 295*)—COLLISION WITH STREET CAR—CONTRIBUTORY NEGLIGENCE—LIABILITY.

Where a motorman on a street railway was injured in a collision at night, at a railroad crossing, between his car and a freight train, and it appears from the evidence that the accident was due to the failure of the motorman to stop his car before venturing to make the crossing, a verdict and judgment in favor of the railroad and the street railway will be affirmed, even though one or both may have been negligent in

not lighting the crossing. In such a case, the darkness of the night is no excuse, where it appears that the motorman, by keeping a proper lookout, could have located the railroad crossing in time to have avoided the collision.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 681, 723–742, 751–756; Dec. Dig. §§ 236, 240;* Railroads, Cent. Dig. §§ 940–942; Dec. Dig. § 295.*]

Breaux, C. J., dissenting.

*(Additional Syllabus by Editorial Staff.)*

5. EVIDENCE (§ 29*)—"PUBLIC STATUTES."

A "public statute" is one of which notice can be taken although not introduced in evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 36, 37, 39, 43–46, 48; Dec. Dig. § 29.*]

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

Action by H. L. Burke against the New Orleans Railway & Light Company and another. From judgment for defendants, plaintiff appeals. Affirmed on rehearing.

Woodville & Woodville, of New Orleans, for appellant. Dart, Kernan & Dart and Foster, Milling, Brian & Saal, all of New Orleans, for appellees.

BREAUX, C. J. Plaintiff instituted this suit for $9,075 for alleged injuries suffered in a collision between the car of which he was the motorman and a train of the Louisiana Railway & Navigation Company.

Plaintiff alleges that these injuries consisted of bruises on his face, a wounded thumb, and alleged permanent injury to his reproductive organs.

The case was tried twice in the district court. In the first trial, the verdict was for plaintiff and the jury assessed the damages at $750 each against both defendants. A new trial was granted. In the second trial the verdict was for defendant.

Plaintiff was motorman on the "Royal Blue Line," operating between the cemeteries and Napoleon avenue. At about 11 o'clock on the night of September 11, 1909, on the west bank of the New Basin Canal near Car-

rollton avenue, his car collided with the side of a freight train at the time that it was crossing the street railway tracks at the intersection of the street car tracks with the Railroad & Navigation Company's tracks.

Plaintiff alleged that defendants were negligent in that they did not provide warning against danger at the crossing. There were no lights, no gates, and no watchman. Plaintiff specially charges that the Louisiana Railway & Navigation Company, after it had entered this city on its way to its southern terminal, backed its train of 23 cars in a way that rendered it impossible for him as motorman of the car of the New Orleans Railway & Light Company to see the train as he came up to the crossing and to avoid the accident of which he was the victim. He charges the other defendant, who was his employer, with negligence in placing him in charge of a car whose brakes were too loose to enable him to properly manage the car.

Plaintiff was a supernumerary called upon to work in place of regular employés. He avers that it was the duty of the company, as well as the other defendant, jointly, to provide safeguards at the crossing, which they failed to do. He also avers that he complained of the brakes of his car.

The first defendant interposed an exception of misjoinder and of no cause of action, to which we have not given much attention for the reason that the argument did not dwell upon the exception at all. All the questions are fully presented on the merits. Each defendant filed an answer and placed at issue all of plaintiff's averments. They denied all liability and alleged that the whole responsibility for the accident was with the plaintiff and that he alone was negligent and completely failed to perform the duties of a motorman.

The plaintiff had been in the employ of the New Orleans Railway & Light Company about five months, and, to borrow the words of the testimony, "was an extra." He had worked only five days on the "Royal Blue Line," to which he was transferred from the work at which he was previously employed for defendant as a motorman.

There is testimony showing that plaintiff said to one of the inspectors of the company, Clyde Flocker, that the brakes were bad, and that the inspector replied that he must go on with the work, as it was Sunday, and nothing could be done to repair the brakes. It is also in evidence that plaintiff made some attempt to adjust the brakes. It is also in evidence that the inspector above referred to stated that it was true that plaintiff had spoken to him, but he did not agree with plaintiff in the statement that he had not found the brakes in good condition; on the contrary, he said that they were in good condition. One of the inspectors found the brakes long but in a serviceable condition.

There is an issue of fact at this point to which we will have occasion to refer later.

Plaintiff testified: That he put on the brakes as soon as he saw the freight cars, but that they did not work satisfactorily. That he immediately thereafter put on his reverse, but that also failed to stop the car in time to prevent the accident. That he did not see the engine at all of the train of the Louisiana Railway & Navigation Company, because it was at some distance in the rear, pushing the cars to their destination. That his time schedule was four minutes for the run from the Halfway House at the cemeteries to the crossing near Carrollton avenue, and, that, in order to be on time, he had to run at the speed at which he was running. That the train of the Louisiana Railway & Navigation Company was being pushed at the rate of three or four miles an hour.

The night was particularly dark, and there was only one passenger on the car at the

time. He was an ex-employé of the New Orleans Railway & Light Company who had been discharged, and he in part corroborated plaintiff. The defendant urged that he was prompted by ill feeling to an extent that rendered him insincere in his testimony.

The conductor of the railway train testified that there was a bridge tender on duty on the night in question and that this bridge tender hollered at the motorman to stop. This conductor was in the caboose of the train next to the engine. He also states that the engineer saw the street car advancing.

William Young, another motorman, had been in the service of the company for a number of years and on the Royal Blue Line for four years. He stated that on approaching the crossing his landmarks were a dairy and houses some 700 feet from the crossing. That there is a stable not far from the crossing, and the cross-over switch is about 200 feet from the crossing. That by the headlight the cross-over switch can be seen at a distance of about 75 feet to 100 feet. He had instructed the plaintiff, Burke, and given him all the instructions possible in one day's run on the Royal Blue Line, and informed him that the stable and the houses near and the cross-over switch were good landmarks to locate the crossing and to take steps toward stopping the car.

The testimony of this witness is taken as indicating the general trend of the testimony of defendant's witnesses in regard to the crossing and the conditions of the track at and near the place of the accident.

This witness testified that the change from one track to the other over the switch is easily made and is hardly felt on the car.

We may as well be accurate when the data are at hand; the tracks of the two roads cross at an angle of 44 degrees and 3 minutes. The track of the Louisiana Railway & Navigation Company runs slightly north of west going out of town, and that of the New Orleans Railway & Light Company runs southeast, coming into town from the cemeteries.

The testimony informs us that there are signals at all other similar crossings in the city.

We concede that a motorman may in the nighttime, as contended by defendant, see first, the lights on Tulane avenue and on Carrollton avenue, and that he may also see the house on the bridge of the Louisiana Railway & Navigation Company, and on the right, first the houses along the right of way, the trash burner, the smokestack, and the water tank of the Ruddock-Orleans Lumber Company, all objects of some prominence. But, it must be borne in mind that this was an extraordinary night which had been preceded by a dark and rainy day. It may well be that a very observant witness will see, while operating a car, lights across the Basin, also lights along Tulane avenue on the other side of the Basin from the side on which this car was running, and that he may even see lights in front on Carrollton avenue at some distance. He may see the little cabin in the middle of the bridge which the railroad train was crossing at the time of the accident.

Plaintiff, it must be remembered, had had limited experience only five days he had worked on this road.

We are informed by the testimony that there was a row of trees along the Basin between the track of the Royal Blue Line and the Basin. This line of trees intercepted the view, it is said, on the left, and rendered it difficult to see the lights on Tulane avenue from the car.

It will be remembered that the accident occurred in September. At that time trees have not lost their leaves, and obstruct the view more than they will in winter when the leaves have fallen. If lights at a distance are to be considered as signals of danger, it

would frequently afford protection to railroad employers and relieve owners of street car lines from the necessity of up keeping precautionary signals. Moreover, as to the Tulane avenue lights, we take it that they are extended from one end of the street to the other. It does not appear which of these lights were to be taken as a warning to stop. Moreover, physical objects, such as the Ruddock sawmill, the dairy, stable, and other buildings, are not the only warning which must be held as sufficient notice to an employé who has limited experience while in the performance of his usual task as motorman. It may be different with a motorman who has experience. The experienced motorman acquires, we presume, a subconsciousness that enables him on very dark nights while operating the car to feel that he is coming to a stop. In this instance, we have no reason to assume that plaintiff had acquired that consciousness and that he was aware at the time that he was near a railway train in front. It is not to be presumed that a motorman of sound mind will recklessly run his car into a passing train.

It is conceded that at the time of the accident there was no light except the light of the stars, the electric lights on Tulane and Carrollton avenues, to which we have already referred, and the light of the car itself.

The headlight of the car was not a sufficient substitute for all danger signals. The distance to which its rays extend varies from 90 to 125 feet. The car can be stopped between 90 and 100 feet. After seeing an obstruction with the assistance of the headlight, there was little time within which to stop at and near the crossing.

Another objection is that the flagging was not thoroughly done, in that the flagman saw to his own train and did not bother very much about the street car. He said that he had not seen the street car at all, although it must have been well within sight. Other objects he saw that other witnesses did not see. He saw the lights on each end of the bridge; other witnesses did not see them.

We return a moment, as we said we would, to the brakes. They were not in good serviceable condition. This is the testimony of even witnesses for the defendant. The witness for the defendant who testified pertinently upon the subject said that, while they were not in good condition, there was no immediate necessity for repairs; that they were not all that they should have been.

The motorman must see that the track before him is clear and also look on each side to avoid collision with pedestrians and others about to cross. Clark's Accident Law (2d Ed.) p. 112.

Generally speaking, a railroad company will be charged with negligence where it fails to give due and timely notice of the approach of its train at highway crossings, even though there is no statute upon the subject. Commentaries on Law and Negligence, White Supplement, p. 290.

Even if plaintiff was not sufficiently careful, he may recover if defendant had it within its power to prevent the accident by the exercise of due care. Clark's Accident Law, p. 111, cited supra.

[1, 5] Statute 120 of 1904, p. 203, is directly pertinent, but it was not introduced in evidence, as neither plaintiff nor defendant knew about it while the case was on trial in the district court. It cannot be considered as a private statute and one of which the court can take no notice. There is good reason given for giving it notice. A "public statute" is one of which notice can be taken, although not introduced in evidence. The whole traveling public is interested. The Legislature conferred a benefit upon the defendant and imposed a duty. Act No. 120 of 1904. It is a duty which affords general protection and the purpose of which can be compelled.

[2] The provision of the act which we have cited above is that the Louisiana Railway & Navigation Company shall maintain and operate at its own expense gates and signals. They are an absolute protection. It is an absolute preventive of accidents at crossings. There is similar protection at other crossings. It being a public statute, there can be no question as to notice. The text of authors upon the subject of evidence supports this view.

See Stephens, p. 163; Wigmore, p. 2572.

In Doss v. Levee District, 117 La. 450, 41 South. 720, notice was taken of a public act. In another case, this court properly held that it will not take notice of foreign statutes; but, even in that case, the court deemed it proper to remand the case in order that justice could be done between the parties.

If it should here become evident that, owing to the want of knowledge an important statute was not known, it would at least become proper to consider whether or not to remand the case.

It is therefore ordered, adjudged, and decreed that the verdict and judgment appealed from are avoided, annulled, and reversed. It is further ordered, adjudged, and decreed that plaintiff have judgment against each defendant for the sum of $500, with interest from the date of this judgment, and that the defendants pay all costs of both courts.

PROVOSTY, J., dissents. SOMMERVILLE, J., takes no part.

### On Rehearing.

LAND, J. This case was tried twice before a jury. On the first trial, the jury by a vote of 10 to 2 found a verdict for $750 in favor of the plaintiff. The trial judge set the verdict aside, and on the new trial the jury found an unanimous verdict in favor of the defendants.

[4] The rehearing was granted mainly on the question of the alleged contributory negligence of the plaintiff, acting as motorman at the time of the accident. Plaintiff admits that he ran his street car into a freight train of the Louisiana Railway & Navigation Company, while it was slowly backing across his front towards the company's bridge over the New Basin Canal. The collision took place at 11:03 p. m. of September 10, 1910. Plaintiff admits that his car was about 35 feet from the railroad crossing before he saw the moving train. Plaintiff evidently did not know that he was near the crossing, and has assigned several reasons for his failure to realize the situation in time to avert a collision. Assuming that the defendants were negligent in not taking proper precautions to guard against collisions with street cars at the crossing, the question remains whether the plaintiff himself could have avoided the accident by the use of ordinary care on his part. Plaintiff knew that the crossing was not lighted, and that no flagman or watchman was there maintained to give warning of the approach of trains over the line of the railroad company.

Plaintiff had served as motorman more than five months, and on the street car line in question had made three separate runs. The accident happened on the fifth day of the last run. In making each trip plaintiff's car crossed the railroad track in going towards Metairie Cemetery, and again in returning therefrom. He crossed and recrossed about once every hour during the evening and night of each day of his run. On the night of the accident he made the return crossing three times after darkness had supervened. On the same night and under the same weather conditions, plaintiff in making his return trip about 11 p. m. ran his car into the freight train on the railroad crossing. If plaintiff saw the crossing at 8, 9, and 10 p. m. and stopped his car as required by city ordinance and the regulations

of the street railway company, what prevented him from seeing the crossing at 11 o'clock of the same night? His explanation is that the cars of the freight train passing across his front hid the lights in Tulane and Carrollton avenues, and the darkness prevented him from seeing other landmarks near the street car track. On the first trial of the case, five witnesses, experienced street railway men, testified that a motorman on a car approaching the railroad crossing at night from the direction of Metairie Cemetery could use as landmarks several houses and other objects near the track, and a cross-over switch 330 feet from the crossing. One of these witnesses also testified that the plaintiff was specifically instructed that a stable, two houses, and the cross-over switch were good landmarks to use to locate the crossing.

Some of the witnesses testified that a motorman under such conditions could also see lights in Tulane avenue and Carrollton avenue some two or three blocks on the far side of the railroad crossing. During the second trial a practical experiment was made, in the presence of some of the jurors, and of counsel for all parties, to show the conditions which confront motormen on a dark night when approaching the railroad crossing in question from the direction of the Metairie Cemetery. As far as possible the conditions existing at the time of the accident were duplicated. When the observations were made, a freight train was backing over the railroad crossing. Three witnesses testified to the result of these observations. All concur that the cross-over could be plainly seen while looking straight ahead as soon as the rays of the headlight fell upon it. The passage of the train did not prevent the observers from seeing the various lights in Tulane and Carrollton avenues, and the large mill, smokestack, and trash burner of the Ruddock-Orleans Company. Of course, the passage of the train did not obscure the view of the railroad bridge over the New Basin Canal, or of any of the landmarks on the Metairie Cemetery side of the crossing. Without going further into details, the testimony of these three witnesses shows that sufficient landmarks were visible to warn a prudent motorman of his near approach to the railroad crossing. If the night was so dark that the plaintiff could not see the usual landmarks, or lights, it behooved him to exercise extraordinary care in approaching the railroad crossing. Not only the evidence, but common experience, demonstrates that the plaintiff could have seen the cross-over switch and the arc lights on the avenues, if he had been keeping a proper lookout. Plaintiff in his testimony admits that immediately after the collision he "saw lights everywhere." The gondola cars could not have shut off his view of the arc lights and the tall buildings beyond the crossing. In failing to see what he could and should have seen, the plaintiff was guilty of contributory negligence.

The condition of the brakes did not contribute to the accident, as the car under no circumstances could have been stopped within the distance of 35 feet. As a matter of law, plaintiff's contributory negligence debars recovery, although defendants may have been negligent as alleged.

It is therefore ordered that our former decree in this cause be vacated, and it is now ordered that the verdict and judgment below be affirmed, and that plaintiff and appellant pay costs in this court.

SOMMERVILLE, J., takes no part.

See dissenting opinion of BREAUX, C. J., 63 South. 55.